## TENNESSEE MINING & MFG. CO. v. NEW RIVER LUMBER CO.

(Circuit Court of Appeals, Sixth Circuit. May 16, 1925.)

No. 4130.

1. **Injunction ⬡113—Plaintiff's dismissal of former suit, to enjoin second cutting over of land, held not to show laches.**

That former suit to enjoin second cutting over of land by purchaser of timber was dismissed by landowner to encourage expected good relations between parties *held* not to show laches depriving owner of right to equitable relief, in absence of any action by purchaser in reliance thereon.

2. **Injunction ⬡198—Landowner held not entitled to accounting of damages accruing prior to filing suit to restrain second cutting over of land.**

Where second cutting over of land by purchaser of timber was acquiesced in by owner and results of rightful and wrongful cutting would be difficult to distinguish, accounting of damages prior to filing of suit to restrain second cutting will be denied.

3. **Evidence ⬡450(8)—Contract granting right to remove timber held ambiguous, justifying resort to surrounding circumstances; "cut over"; "cut"; "cutting."**

Contract, granting "all standing and down timber of all sizes of (certain) trees which may be upon the land at time of cutting thereof" for 25 years, *held* ambiguous, justifying resort to surrounding circumstances and general considerations for its construction; land from which desired timber has been removed being "cut over" or "cut," and "cutting" referring either to land or to trees.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Cut—Cutting.]

4. **Logs and logging ⬡3(10)—Contract granting timber held not to grant right to cut over land second time.**

Under contract granting "all standing and down timber of all sizes of (certain) trees which may be upon the land at the time of cutting thereof" for 25 years, where purchaser had taken out all desired trees from any particular tract without indicating that it was not intending to exercise its full privilege, privilege as to that particular tract *held* exhausted and no right of recutting existed, but such inference should not be drawn as to tract on which it ceased operations in expectation of compromise purchase thereof, which was never made, or as to substantial tracts of timber left untouched, etc.

Appeal from the District Court of the United States for the Eastern District of Tennessee; Xenophon Hicks, Judge.

Suit by the Tennessee Mining & Manufacturing Company against the New River Lumber Company. Bill dismissed, and plaintiff appeals. Reversed and remanded.

In 1905, appellant's predecessor, hereinafter called, with appellant, the Land Company, owned a 54,000-acre tract of land in Eastern Tennessee. The Lumber Company, appellee, desired to cut the lumber, and a contract was made by which the timber was sold to the Lumber Company, with the privilege of cutting. By this instrument the Land Company granted to the Lumber Company "all the standing and down timber, of all sizes, of hickory, ash and persimmon, linden and dogwood trees which may be upon the land hereinafter mentioned at the time of cutting thereof, and all the standing and down timber, of all varieties of trees, of a diameter of twelve inches or over at the point of cutting at the time of cutting thereof, cut or down within twenty-five years from the date hereof, and all timber of all varieties under twelve inches in diameter required by the party of the second part to build and maintain its lumber camps, stables, necessary buildings, dams, roads, railroads, slides, ways, tramways and other requirements, in connection with the cutting, transporting, utilizing and manufacturing said timber." The habendum clause was "for a period of twenty-five years." The tract comprised the valley of a river with a rough and mountainous country on each side, and included many tributary valleys which came into the main one. The approved method of lumbering, which was in the minds of all parties, contemplated building a sawmill near the lower end of the tract, building a railroad from the sawmill up the main valley, and then building branch railroads up some of the tributary valleys. It was also the usual practice, and was doubtless in contemplation, that when the lumber in the secondary valley had been cut as far as the Lumber Company cared to cut it, the branch railroad therein would be pulled up and would be laid down again in another one, where the next section of the lumbering operation would be continued. It was also a part of the understood and contemplated situation that the lands were valuable, or supposed to be valuable, for coal mining, that the building of the railroad by the Lumber Com-

pany would aid in the development of the tract as mining property, and that the timber under 12 inches which the Lumber Company was to leave upon the land would furnish the mining timber necessary for that development.

The controversy is as to the right of the Lumber Company to go back and cut over a second time land which it had once cut over. It is the contention of the Lumber Company that at any time before the expiration of the 25 years it may cut anywhere upon the tract any tree which at that moment is more than 12 inches in diameter. It is the contention of the Land Company that when the privilege of cutting has been once exercised upon any particular sub-tract, it is exhausted, and there is no remaining future right to cut the trees which the Lumber Company then elected not to cut, or which may within the remainder of the 25 years reach the prescribed minimum size.

The bill was filed by the Land Company to enjoin the Lumber Company from a continuance of the second cutting over. The court below dismissed the bill.

J. A. Fowler and N. B. Morrell, both of Knoxville, Tenn. (J. A. Fowler, Lindsay, Young & Young, and Fowler & Fowler, all of Knoxville, Tenn., on the brief), for appellant.

L. D. Smith, of Knoxville, Tenn., and E. G. Foster, of Huntsville, Tenn. (Anderson & Word and L. D. Smith, all of Knoxville, Tenn., on the brief), for appellee.

Before DENISON, MACK, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1, 2] 1. We are not convinced that there has been sufficient laches to prevent the aid of equity in protecting whatever rights the Land Company has. It is true that a former suit of the same general character as this, after pending for some time, was voluntarily dismissed by the Land Company; but this dismissal was by way of encouraging expected good relations between the parties; and we do not see that the Lumber Company has depended upon that dismissal in taking any action which will be affected by our conclusion. However, we conclude that in so far as there had been by the Lumber Company before this suit any violation of the Land Company's rights, as we find such rights to have existed, there has been such acquiescence by the Land Company and there will be such difficulty in distinguishing between the results of rightful

and those of wrongful cutting, that the case is, in our judgment, not suitable for any accounting of damages prior to the filing of this bill.

[3] 2. We find in the contract a distinct ambiguity justifying resort to the surrounding circumstances and to general considerations in order to get the true construction. The case is so unique in its precise determinative facts that we get no specific help from the decisions that have been cited to us; the general principles of construction involved are entirely familiar.

Where a tract of timber land is subjected to a "lumbering operation" by which the desired trees are cut and the logs removed, the land is said to be "cut over"; it is also common to speak of the land merely as "cut," and for the operator to say, for example, that he cut 200 acres last year and will cut the same amount this year. The word "cutting" may therefore refer to the trees or to the land; and when we find this contract referring to "all the standing and down timber of all sizes of (certain) trees which may be upon the land hereinafter mentioned at the time of cutting thereof," the word "thereof" may refer either to the precedent "land", or to the precedent "trees." Perhaps, in strictness, it would be taken to refer to the nearest precedent word to it to which it might relate, and therefore to "land." In the next clause, referring to all kinds of trees over 12 inches at the time of the cutting thereof, there is not the same alternative antecedent, but the word "thereof" can hardly be thought to be used in different senses in adjacent clauses. Hence, our conclusion that there is an ambiguity.

[4] It was known to both parties that it was the customary method of lumbering, and made almost necessary by considerations of efficiency and economy, to cut a particular sub-tract clean and finish the operation while engaged in it; that such lumbering must be done, and this was to be done, by temporary branch railroads, extended up the creek valleys and by numerous "snake roads" to be built up the sides of the hills; that the building of these temporary roads would consume large amounts of the small timber under 12 inches; that after tearing up the railroad and removing it to another creek valley and abandoning all the other temporary work done in the first valley, it would be an unheard of and rather absurd thing to come back again later, do the temporary work over again, and get a rather trifling amount of timber; that mining operations which would require all the timber under 12 inches

which had not been used for roadways, etc., in lumbering operations, were expected to follow; and it was obvious that since mining operations could not be carried on without timber, and since even though the Lumber Company had cut over a tract of land and seemingly finished with it, if a mining company could not use the remaining timber, because within 25 years it might grow to be 12 inches in diameter and the Lumber Company might come back and cut it, all future mining operations would be embarrassed, if not prevented, for 25 years. It was apparent, too, that large quantities of this smaller stuff would be used for roadways, etc., and that to do this slashing a second time, in connection with a second cutting, might leave the land almost denuded of timber.

In this situation, an intent that the Lumber Company, after having completely cut over a well-defined and limited sub-tract, and after having taken therefrom all the timber which it was entitled to take and desired to take, should nevertheless have the right to come back again in 5 years and again in 10 years and again in 20 years, and again use small trees for roadways, etc., while it cut the trees which it had deliberately left or which had, in the meantime, grown over the limit, and where such right to recut could have no economic value to the Lumber Company but only a "nuisance value"—any such intent would be so abnormal that it could be inferred only from the clearest and most unambiguous language; and we do not find this intent so stated.

The true intent of the contract, in our judgment, was to give the Lumber Company the privilege of cutting over this land in successive steps in the usual way during the prescribed period, and not to give an arbitrary right to cut all individual trees that grew to the prescribed limit within 25 years, regardless of all other considerations. We think that whenever the circumstances justify the inference, as to any particular sub-tract, that the Lumber Company had cut it over and had taken all the trees it desired to take, and without indication that it was not intending to exercise its full privilege, the privilege should be considered, as to that special sub-tract, exhausted, and that no further or general right of recutting existed. We intend to state this inference of exhaustion in carefully restricted terms. The inference should not be drawn in an instance like the one which chiefly provoked this bill. While the original cutting was in progress in one creek valley, a controversy arose between the

5 F.(2d)—36

Lumber Company and a mining company as to the extent of the cutting right upon a certain tract of 600 acres (or perhaps the tract was a larger one). In the expectation, if not with the understanding, that the mining company would buy at a compromise figure the claimed cutting rights, this particular lumbering operation was abandoned and the branch railroad pulled up and moved to another valley. Later it developed that there was a misunderstanding and the expected purchase never was made. Under these circumstances, this cutting privilege was not exhausted, and the Lumber Company had the right, some years later, to go back and finish that operation from the point where it had been stopped—regardless of whether or not it could make a profit by doing so—but not the right to cut over again those same acres which it had once cut over and finished during the progress of its former incompleted operation. Further, our interpretation is not intended to disparage but to concede the right of the Lumber Company, in its first operation, to leave untouched any substantial body of timber, like that over the summit of a ridge which might later be better reached from the other side, or to leave untouched all trees of a certain kind for which the market at that time was bad, and for which great increases in value might be anticipated; but in order to justify any right to go back and get such trees, they must have been of sufficient number and importance to form a reasonable basis for concluding that there was a reserved intent to go and get them later. For an illustrative example, we may say—without intending to intimate a conclusion—that it might be that the hickory trees would have such an individual or class value, even if they were left during the general lumbering operation, as to indicate an expectation of taking them out later individually, even not in connection with any general operation.

Further, we would not disparage but would concede the right of the Lumber Company to cut some trees and leave others (and take these later), much more arbitrarily, along the immediate line of its permanent railroad and not thereby to create any inference that it had finished and exhausted its privilege of such cutting in that locality.

The opinion of the trial court forcefully presents the extreme illustrations of difficulties flowing from the Land Company's full contention; most of these difficulties disappear by application of the intermediate construction we have adopted. True, the Lumber Company had the right to delay its cut-

ting, in any particular locality, until nearly the end of the period, and thereby get all the increased growth; but the Land Company knew that to meet practical conditions the cutting must be begun promptly and continued diligently during nearly the whole time, or else the territory could not be covered; it took its chances that the general average would be about 12½ years.

Our conclusion as to the right interpretation of the contract is confirmed by the proofs as to the actual intent of the parties at the time. Both parties understood that no right of general recutting was given.

The record does not give sufficient data for a final disposition of the case according to the principles of construction of the contract which we have stated. Since the contract was otherwise interpreted by the court below and the case was not viewed in what we think the right aspect, we have not considered whether the Land Company makes out any case for relief, or, if so, how much. But we conclude that the decree should be reversed, and the case remanded for further proceedings in accordance with this opinion. Whether the District Court will think proper to enter a decree upon the present record, or to take further proofs in order to get more accurate data, will be determined by that court in its discretion.